UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IVAN VON STAICH,

        Petitioner,

vs.

A. P. KANE, Warden,

        Respondent.

No. C 04-3767 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner, a California prisoner incarcerated at the Correctional Training Facility in Soledad ("CTF"), has filed a petition for a writ of habeas corpus challenging the 2002 decision of the Board of Parole Hearings ("Board," formerly the Board of Prison Terms) denying him parole. For the reasons set forth below, the petition, as amended, is denied.

## BACKGROUND

In May 1986, petitioner was sentenced to an indeterminate term of seventeen years to life following his convictions by a jury in the Orange County Superior Court of second degree murder and attempted murder. The Board summarized the facts of the commitment offense as follows:

> The prisoner's relationship with Cynthia Bess [the attempted murder victim] was interrupted in 1980 when he was convicted of a Federal offense and imprisoned in the Terminal Island Federal Penitentiary. The pair communicated by telephone and mail until 1983. The prisoner was released to a halfway house in Long Beach on June 9 of that year. And when the victim visited him there on several occasions she was affectionate. But in the meantime she had met Robert Topper, and as her interest in him grew, she communicated less frequently with the prisoner. He was returned to prison on June 29 after breaking into Bess's former residence in search of her, and lost direct contact while serving the balance of his sentence.
>
> Frustrated with the uncertainty of the situation, the prisoner sent the victim letters in which he professed his love and threatened to harm her if she left him for another man. He made at least 67

> collect telephone calls to the victim's father in July and August of 1983 in a fruitless attempt to locate her. He also telephoned Topper on numerous occasions and repeatedly threatened him, wanting him to stay away from the victim. He did not discover the victim's whereabouts during this time. However, the prisoner was released from Terminal Island on November 4, 1983 and learned the victim was staying at her grandparent's home, although he was apparently unaware that she had married Topper.
>
> In the early morning hours of December 8, 1983, the prisoner went to the grandparent's home armed with a hammer. He cut the telephone wires to the residence and then kicked in the front door. Topper was brutally slain. Numerous hammer blows were inflicted to his head, and he was shot four times at close range in the back of his neck. The victim Bess survived multiple blows, probably with a handgun, to the head. Her skull was cracked, crushed; however, the [resulting] brain damage left her incompetent to testify.
>
> The prisoner himself was shot once or twice, suffering wounds to a hand, an arm and ribcage. He went to a nearby home for help. At the hospital he told police the purpose of his odd hour visit was merely to discuss the situation with the victim. He snipped the telephone wires because he assumed she would immediately call the police upon seeing him. He brought the hammer to gain entry through the window. When the prisoner got to the door, however, someone threatened to kill him. He yelled that he did not have any problems, but another threat was [hurled]. He then kicked in the door and was confronted by gunfire from Topper. Despite being wounded, he charged Topper and as the two men struggled the gun discharged. He also struck Topper on the head. After the fight with Topper, the prisoner was confronted by Bess. [Ignoring] his plea to talk she too opened fire with a handgun and threatened to kill him. The prisoner admittedly beat her before leaving with the weapon. Both belonged to Topper and were recovered from the bed of the prisoner's truck. One contained six empty cases. The other was a starter pistol that fired only blanks. Two of its six rounds were expended.

Answer Ex. 2 ("Nov. 5, 2002, Board Transcript") at 14-18 (transcribed corrections omitted).

On November 5, 2002, petitioner and his attorney appeared before the Board for his initial parole consideration hearing. The Board determined that petitioner was not suitable for parole and denied parole for four years. On November 22, 2002, petitioner filed a petition for writ of habeas corpus challenging the Board's decision in the Supreme Court of California, which summarily denied the petition on March 5, 2003. Answer Exs. 6, 7. On January 22, 2003, petitioner filed an administrative appeal of the 2002 decision, which the Board denied on June 10, 2003.

Following the denial of the administrative appeal, petitioner filed a habeas petition on October 8, 2003, in the Orange County Superior Court, which denied the petition two days later. Answer Exs. 8, 9. Petitioner subsequently sought relief from the court of appeal and the state supreme court, which denied his habeas petitions on November 21, 2003, and December 12, 2003, respectively. *See* Mot. Dismiss Ex. 2 (Pet. for Writ of Habeas Corpus in the Supreme Ct. of Cal. and Ex. CC thereto).

On July 13, 2004, petitioner filed a petition for writ of habeas corpus in the District Court for the Central District of California, which transferred the petition to this court on August 24, 2004. Pursuant to the court's March 12, 2007, Order Granting Respondent's Motion to Dismiss, petitioner filed an amended petition. Following the Order to Show Cause, respondent filed an answer to the amended petition, and petitioner filed a traverse. The matter is submitted for a decision on the merits.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

*Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application" of Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of a state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-806 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001). Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal court conducts "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. *See Plascencia v. Alameida*, 467 F.3d 1190, 1198 (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## DISCUSSION

The amended petition challenges the Board's 2002 decision on three grounds: (1) his due process rights were violated because the "some evidence" standard was used to deny parole; (2) his due process rights were violated because the denial of parole subjects him to the punishment provided by California law for first degree murder, not the second degree murder for which he was convicted; and (3) the rejection of parole violated the Americans with Disabilities Act, in that parole was denied in part because he had not

4

obtained vocational training that he is not physically able to do, and violated his due process rights because it did not conform to state law.  None of these claims merits relief.

Petitioner also raises new claims in the traverse, including challenges to the Board's alleged refusal to consider evidence submitted by counsel and to the former governor's "no parole policy."  Traverse at 36-42.  New claims for habeas relief are not properly raised in a traverse and are not considered here.  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994), *cert. denied*, 514 U.S. 1026 (1995).

The court first considers respondent's challenge to the petition as untimely, which fails for the reasons stated below.

**I.   Timeliness**

Respondent contends that petitioner failed to file his federal petition within one year of the state supreme court's denial of habeas relief on March 5, 2003.  The limitations period did not begin to run, however, until the Board denied petitioner's administrative appeal on June 10, 2003.  Furthermore, the limitations period was tolled during the pendency of his petitions for collateral review by the state courts.

AEDPA requires that petitions filed by prisoners challenging non-capital state convictions or sentences must be filed within one year of the latest of: (A) the date on which the judgment became final after the conclusion of direct review or the expiration of the time for seeking direct review; (B) the date on which the impediment to filing an application created by unconstitutional state action was removed, if such action prevented petitioner from filing; (C) the date on which the constitutional right asserted was recognized by the Supreme Court, if the right was newly recognized by the Supreme Court and made retroactive to cases on collateral review; or (D) the date on which the factual predicate of the claim could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1).  Time during which a properly filed application for state post-conviction or other collateral review is pending is excluded from the one-year time limit.  *Id.* § 2244(d)(2).

Where, as here, the petition is directed to a denial of parole, the date the statute of limitations begins to run is the date when the factual predicate of the claim could have been

1 discovered through the exercise of due diligence, which is the date the parole denial
2 became final. 28 U.S.C. § 2244(d)(1)(D). *See Shelby v. Bartlett*, 391 F.3d 1061, 1064-66
3 (9th Cir. 2004); *Redd v. McGrath*, 343 F.3d 1077, 1084 (9th Cir. 2003) (limitations period
4 began to run the day after the Board denied prisoner's administrative appeal). The Board's
5 administrative decision denying petitioner parole became final on June 10, 2003, when it
6 denied petitioner's administrative appeal. As respondent points out, the administrative
7 appeal process has since been repealed, but the change did not become effective until
8 January 21, 2004, after petitioner's initial parole hearing and administrative appeal became
9 final. Cal. Pen. Code Ann. § 3041(b). The date of the Board's decision denying petitioner's
10 administrative appeal therefore triggered the limitations period, which began to run the next
11 day, June 11, 2003. *Redd*, 343 F.3d at 1085. *See* Fed. R. Civ. Proc. 6(a)(1).

The limitations period ran for 120 days until October 8, 2003, when petitioner filed his habeas petition in superior court. On that date, the limitations period was tolled for the time during which his applications for collateral review in state court were pending. 28 U.S.C. § 2244(d)(2). Tolling applies to one full round of collateral review. *Carey v. Saffold*, 536 U.S. 214, 223 (2002). In California, where prisoners generally use the state's "original writ" system,[1] the limitations period thus remains tolled during the interval from the time the first state habeas petition is filed until the state supreme court rejects the final collateral challenge, provided the petitioner did not delay unreasonably in seeking review in the higher court. *See id.* at 220-25; *accord Nino v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999), *cert. denied*, 529 U.S. 1104 (2000). Petitioner filed his first state habeas petition in superior court on October 8, 2003; he filed subsequent petitions in the court of appeal and state supreme court, which rejected his final challenge on December 12, 2003. The court

---

[1] In California, the supreme court, intermediate courts of appeal, and superior courts all have original habeas corpus jurisdiction. *Nino v. Galaza*, 183 F.3d 1003, 1006 n.2 (9th Cir. 1999), *cert. denied*, 529 U.S. 1104 (2000). Although a superior court order denying habeas corpus relief is non-appealable, a state prisoner may file a new habeas corpus petition in the state court of appeal. *Ibid.* If the court of appeal denies relief, the petitioner may seek review in the state supreme court by way of a petition for review, or may instead file an original habeas petition. *Id.* at 1006 n.3.

6

determines that petitioner properly pursued his state collateral remedies and that the limitations period was tolled during this time interval. *Nino*, 183 F.3d at 1006-07. *See also Evans v. Chavis*, 546 U.S. 189, 201 (2006).

Respondent contends that petitioner is not entitled to statutory tolling because he initially filed an original habeas corpus petition in the state supreme court on November 22, 2002, only seventeen days after he was denied parole, and argues that the limitations period should start to run from the day after the supreme court denied his petition on March 5, 2003. Respondent further contends that petitioner delayed unreasonably in seeking relief from the lower state courts in October 2003, and should not be entitled to tolling. Although petitioner filed a premature petition for habeas relief from the state supreme court, the limitations period did not begin to run until the Board's decision became final with the denial of petitioner's administrative appeal on June 10, 2003. Petitioner filed his state habeas petition in superior court 120 days into the limitations period, and did not delay unreasonably in filing subsequent petitions in state court. Respondent's argument against statutory tolling thus fails.

Following the complete round of collateral review by the state courts, the limitations period resumed on December 13, 2003, the day after the supreme court denied relief, and ran another 214 days until July 13, 2004, when petitioner filed this petition in the Central District of California: *Von Staich v. Cal. Dept. of Corrections, et al.*, No. 04-0831 (C.D. Cal.). The petition was subsequently transferred to this court. Thus, the limitations period had run for a total of 334 days when petitioner filed his federal petition and it was, therefore, timely.

**II.    Claims for Relief**

   **A.    Due Process**

       **1.    Some Evidence Standard of Judicial Review**

Respondent contends that state prisoners do not have a federally protected liberty interest in parole. However, the Ninth Circuit has determined that a California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability

7

proceedings. *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (citing *Board of Pardons v. Allen*, 482 U.S. 369 (1987); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979)). *See also Irons v. Carey*, 505 F.3d 846, 851 (9th Cir.), *reh'g and reh'g en banc denied*, 506 F.3d 951 (9th Cir. 2007); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1127-28 (9th Cir. 2006), *reh'g and reh'g en banc denied*, No. 05-16455 (9th Cir. Feb. 13, 2007); *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003) (finding initial refusal to set parole date for prisoner with fifteen-to-life sentence implicated prisoner's liberty interest).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. *Sass*, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)). *See also Irons*, 505 F.3d at 851. "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. *Sass*, 461 F.3d at 1128 (quoting *Hill*, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

Respondent contends that on federal habeas review, the some evidence standard of review does not apply to parole suitability determinations, and suggests that an inmate is entitled to only minimal protections to satisfy due process in a parole proceeding, namely, an opportunity to be heard and a detailed explanation of the decision. The Ninth Circuit, however, has held that requiring less than the some evidence standard "would violate clearly established federal law because it would mean that a state could interfere with a liberty interest - that in parole - without support or in an otherwise arbitrary manner." *Sass*, 461 F.3d at 1129. The Ninth Circuit has repeatedly held that the some evidence standard set forth in *Superintendent v. Hill* is clearly established law in the context of parole denial

8

for purposes of federal habeas review. *See Irons*, 505 F.3d at 851; *Sass*, 461 F.3d at 1128-29. Respondent's challenge to the some evidence standard of review thus fails.

### 2. Standard of Proof

In his first claim, petitioner contends that the Board conducted the 2002 hearing under the wrong evidentiary standard. Petitioner contends that the Board violated his right to due process by applying the some evidence standard and contends that parole decisions should be governed by the preponderance of evidence standard, citing *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). *Hamdi* addressed the process due to a United States citizen held as an enemy combatant, requiring notice of the factual basis for his detention and a meaningful opportunity to rebut the government's assertions before a neutral decisionmaker. 542 U.S. at 533. The plurality opinion noted that the some evidence standard was the appropriate standard for judicial review of an administrative record, but determined that it was not suitable to review the Government's basis for detention where the detainee had received no prior proceedings or minimal due process. *Id.* at 537. Petitioner relies on Justice Souter's concurring opinion which questioned, without deciding, whether Hamdi would qualify for treatment under provisions of the Geneva Convention, including determination by a tribunal by a preponderance of evidence of his status as a prisoner of war. *Id.* at 550; *see id.* at 534 n.2. Contrary to petitioner's contention, *Hamdi* does not suggest that the preponderance of the evidence standard governs administrative proceedings such as parole suitability hearings.

Furthermore, as respondent points out, petitioner has not demonstrated that the Board relied upon a "some evidence" standard of proof to determine petitioner's parole suitability. As discussed above, the some evidence standard is the applicable standard of federal habeas review of a petition challenging parole denial under the AEDPA, but is not a standard of proof. *See Hamdi*, 542 U.S. at 537 ("we have utilized the 'some evidence' standard in the past as a standard of review, not as a standard of proof. . . . That is, it primarily has been employed by courts in examining an administrative record developed after an adversarial proceeding - one with process at least of the sort that we today hold is

9

constitutionally mandated in the citizen enemy-combatant setting.").

Nor has petitioner demonstrated that the Board is required under state law to apply a some evidence standard of proof. To the contrary, state courts have recognized "[a]lthough principles of due process apply, the parole authority is not required to proceed with the formality required of courts." *In re Morrall*, 102 Cal.App.4th 280, 294 (2002). Rather, "'the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious.'" *In re Burdan*, 161 Cal. App. 4th 14, 24 (2008) (quoting *In re Rosenkrantz*, 29 Cal. 4th 616, 677 (2002), *cert. denied*, 538 U.S. 980 (2003)). *See also In re Singler*, 161 Cal.App.4th 281, 294 (2008) (recognizing that parole release decisions are left to the Board's discretion and subject to limited judicial review) (citing *Rosenkrantz*, 29 Cal. 4th at 655). Petitioner's claim alleging that the Board applied a "some evidence" standard of proof thus fails.

### 3.  **Some Evidence to Support Board Decision**

As the Ninth Circuit has determined that the some evidence standard is the applicable standard of review in the context of parole denial, the court proceeds to determine whether there was some evidence in the record to support the Board's decision.

In assessing whether the Board's denial of parole was supported by some evidence, the court's "analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851 (citing *Biggs*, 334 F.3d at 915). "Accordingly, here we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' in [petitioner's] case constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454, 105 S.Ct. 2768." *Ibid.* Under California law, "[t]he Board must determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in

10

Cal. Code. Regs., tit.15 § 2402(c)-(d)." *Ibid.*

Title fifteen, section 2402, of the California Code of Regulations sets forth the criteria for determining whether an inmate is suitable for release on parole. The circumstances tending to show that a prisoner is unsuitable include the following: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner;" (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others;" (4) commission of "sadistic sexual offenses;" (5) "a lengthy history of severe mental problems related to the offense;" and (6) "serious misconduct in prison or jail." Cal. Code. Regs., tit. 15 § 2402(c). The circumstances tending to show that a prisoner is suitable for parole include the following: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; (4) the prisoner committed the crime as a result of significant stress; (5) the prisoner suffered battered woman's syndrome at the time of committing the crime; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner's present age reduces the risk of recidivism; (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release;" and (9) institutional activities "indicate an enhanced ability to function within the law upon release." Cal. Code. Regs., tit. 15 § 2402(d).

The Orange County Superior Court denied habeas relief upon finding that some evidence supported the Board's decision to deny parole:

> In Petitioner's case, the BPT made the preliminary determination that he *would* pose an unreasonable risk of danger to society if released. It based this preliminary determination on the nature of the original offense, finding it was carried out in an especially cruel, callous, calculated and dispassionate manner. Multiple victims were attacked; both were abused and mutilated. The BPT found the offence was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering. The BPT also found that the motive for the crime was inexplicable or very trivial in relation to the offense. The BPT reached these conclusions based on the facts of the crime: Petitioner tracked down his ex-girlfriend, cut the telephone wires to her residence, and kicked in the front door. There were numerous hammer blows to the murder victim's head, and four close range bullet holes in his back and neck. The ex-girlfriend also received multiple blows to her head which

> crushed her skull.
>
> The BPT went on to find that Petitioner had failed previous grants of probation and parole and could not "be counted upon to avoid criminality." It further found he had an unstable social history, had threatened other victims in the past, had failed to develop a marketable skill, had failed to upgrade vocationally, had failed to participate in self-help programs, and had failed to demonstrate evidence of positive change. He had received recent "disciplinaries" for mailing threatening and intimidating correspondence and for damaging state property. A psychiatric report from February 2002 was "negative . . . in terms of release." It noted Petitioner presented a threat that was higher than the average citizen. It found Petitioner lacked realistic parole plans, including residential and employment plans.

Answer Ex. 9 at 3-4 (*In re Ivan Von Staich*, No. M-10039 (Super.Ct. Oct. 10, 2003)).

The record reflects that the Board considered various factors of unsuitability: the cruel nature of the commitment offense; petitioner's criminal and unstable social history, including threatening past girlfriends and more recently sending threatening letters from prison to his ex-wife; and his institutional behavior, including nine "115" serious rule violation reports and five "128" counseling memos. *See* Nov. 5, 2002, Board Transcript at 21, 30-33, 37-39, 49; Answer Ex. 4 (Oct. 2002 Evaluation Report). The Board considered the October 2002 evaluation by the correctional counselor, who opined that petitioner "would probably pose a high degree of threat to the public at this time if released from prison." Nov. 5, 2002 Board Transcript at 51. The Board also considered two psychological evaluations, dated February 2002 and March 1996. *Id.* at 51-58. In the more recent evaluation, the psychologist opined that petitioner's "violence potential is estimated to be somewhat higher than the average citizen in the community," based on his "pattern of possessive jealousy towards girlfriends and an inability to tolerate feeling rejected by them or to allow them to be 'possessed' by another man," his "clear history of writing threatening letters from prison," and continuation of his threatening behavior and attitude "as recently as five and a half years ago, when he wrote a threatening-sounding letter to his ex-wife, Paula." *Id.* at 55-56; Answer Ex. 5 (Feb. 22, 2002 Mental Health Evaluation). The Board also considered the testimony of the Deputy District Attorney of Orange County who opposed the setting of a parole date at that time. Nov. 5, 2002 Board Transcript at 62-65.

12

With respect to evidence of parole suitability, the record demonstrates that petitioner and his attorney had an opportunity at the hearing to present testimony and argument in support of suitability, including his plans for release and his emotional and mental abuse by the victim when the crime was committed. *See id.* at 18-22, 28-32, 58-59, 69-76. The Board also commended petitioner's positive behavior during incarceration, but determined that his positive behavior did not outweigh the factors of unsuitability. *Id.* at 89.

The superior court's finding that some evidence supported the Board's decision is reasonable given the evidence of unsuitability in the record. *See* Nov. 5, 2002, Board Transcript at 85-93. Therefore, the state courts' denial of habeas relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

### B. Increasing Sentence

Petitioner contends that by denying him parole, the Board effectively imposed a sentence commensurate with a sentence for first degree murder, rather than second degree murder. Petitioner contends that he has served his minimum sentence for second degree murder under the matrix guidelines, and that the Board should have set his maximum sentence and set a release date.

Petitioner refers to title fifteen, section 2403, of the California Code of Regulations, which sets forth a matrix of base terms for second degree murder. Those regulations provide in part: "The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime." Cal. Code Regs. tit.15, § 2403.

It has long been established under state law that the suitability determination precedes any effort to calculate a parole release date. *See In re Dannenberg*, 34 Cal. 4th 1061, 1080, *cert. denied*, 546 U.S. 844 (2005). In *Dannenberg*, the California Supreme Court held that Section 3041 does not require the Board to set a term of years for prisoners sentenced to indeterminate terms. *Id.* at 1082-84. That is not required until the Board finds the prisoner suitable for parole. *Ibid.* Because the Board determined that petitioner was not suitable for parole, the Board was not required to set a parole release date or apply the

matrix of base terms. *See Irons*, 505 F.3d at 851 n.3. This claim therefore fails.

In a related challenge, petitioner contends that he was convicted of only second degree murder, and that by denying him parole, the Board imposed a sentence within the guidelines for first degree murder, and violated his right to have a jury determine any fact that increases his sentence pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). He also contends that this increased sentence violates the Double Jeopardy Clause.

The statutory maximum for petitioner's crime, murder in the second degree, is life imprisonment. Cal. Penal Code § 190(a). No additional facts must be found beyond those which were found by the jury at petitioner's trial in order for him to be imprisoned for life. Petitioner has no right to a jury trial in connection with parole determinations before the expiration of his life sentence. *See Blakely v. Washington*, 542 U.S. 296, 308-09 (2004) ("indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion"). Furthermore, petitioner has not been subjected to double jeopardy or multiple punishments for his crime by serving his life sentence.

The state courts' denial of these claims was neither contrary to, nor an unreasonable application of, clearly established federal law.

### C.    Americans with Disabilities Act

Petitioner suffers from intervertebral disc disease and other medical conditions which limit his ability to sit or stand for long periods. He contends that the Board discriminated against him on the basis of his disabilities by requiring him to obtain vocational training without regard for his medical problems.

Title II of the Americans with Disabilities Act of 1990, 42 U.S.C.§ 12101 et seq. ("ADA"), provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II challenges to the Board's parole decisions that question the validity of continuing confinement may be brought in a petition for habeas

14

relief. *Thompson v. Davis*, 295 F.3d 890, 896-97 (9th Cir. 2002), *cert. denied*, 538 U.S. 921 (2003); *Bogovich v. Sandoval*, 189 F.3d 999, 1002-03 (9th Cir. 1999). The Board "may not categorically exclude a class of disabled people from consideration for parole because of their disabilities," but "Title II does not categorically bar a state parole board from making an individualized assessment of the future dangerousness of an inmate by taking into account the inmate's disability." *Thompson*, 295 F.3d at 898 and n.4.

In the absence of a reasoned decision by a state court on the ADA claim, the court conducts an independent review of the record and determines that the Board took petitioner's disability into account and made an individualized assessment of his parole eligibility. The record reflects that the Board considered documentation of petitioner's medical conditions, restricting him to lifting no more than fifteen pounds. Nov. 5, 2002 Board Transcript at 52-53. Petitioner testified at the hearing that he had been limited to light duty work programs because of his physical limitations. *Id.* at 53-54. His attorney also argued that petitioner's disabilities raised concerns under the ADA about ability to comply with the Board's criteria that the prisoner obtain vocational training to support himself once released. *Id.* at 71-72.

In its decision, the Board acknowledged petitioner's ADA concerns with respect to his vocational programming, but reasoned that in light of the totality of petitioner's prison term, he had been "incarcerated for a substantial amount of time and during that time the prisoner [had] not been enrolled in any vocational programs" or self-help programs. Nov. 5, 2002 Board Transcript at 92. The Board considered that during his incarceration, he "had the opportunity to develop marketable skills that could be put to use upon release, and . . . to participate in meaningful self-help programs, in particular . . . Anger Management and dealing with rage and those kinds of programs." *Ibid.* As the Board conducted an individualized assessment of parole suitability and considered petitioner's medical conditions, petitioner has not demonstrated that the Board discriminated against him on the basis of his disabilities. *Thompson*, 295 F.3d at 898 n.4. The state courts' denial of relief on this claim was neither contrary to, nor an unreasonable application of, clearly

15

established federal law.

## CONCLUSION

Based on the foregoing, the petition for a writ of habeas corpus is DENIED. The clerk of the court shall enter judgment for respondent and close the file.

**IT IS SO ORDERED.**

Dated: June 19, 2008.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.04\STAICH3767.deny.ord.wpd